UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

* * * * * * * * * * * * * * * * * * *

Jonathon McClelland,

Plaintiff,

vs.

ORDER
and
REPORT AND RECOMMENDATION

Patrick McGowan, Hennepin County Sheriff, and the following deputies: Thomas Tichich, Ryan Law, Warolin, Matthew Keith, Joseph Schwartz, S. Skweres, R.N., and Amanda Moran,

Defendants.

Civ. No. 01-1465 (ADM/RLE)

* * * * * * * * * * * * * * * * * * *

At Duluth, in the District of Minnesota, this 3rd day of August, 2002.

I. Introduction

This matter came before the undersigned United States Magistrate Judge pursuant to a special assignment, made in accordance with the provisions of Title 28 U.S.C. §636(b)(1)(A) and (B), upon the Defendants' Motion for Partial Summary Judgment, and their Motion to Accept the Affidavit of Carrie Kane Wessels ("Wessels"). A Hearing on the Motions was held on May 30, 2002, at which time the Plaintiff appeared by Michael J. Dougherty, Esq., and the Defendants appeared by Toni A. Beitz, Assistant Hennepin County

AUG 13 2002
FILED
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD
DEPUTY CLERK

Attorney. For reasons which follow, we deny, as moot, the Defendants' Motion to accept the Affidavit of Wessels, and we recommend that the Defendants' Motion for Partial Summary Judgment be granted.

## II. Factual and Procedural History

In May of 2000, the Plaintiff was an inmate at the Minnesota Correctional Facility, in Stillwater, Minnesota ("MCF-STW"). At approximately 8:00 o'clock p.m. on May 24, 2000, the Plaintiff was transported to the Hennepin County Adult Detention Center ("ADC") on a writ of habeas corpus ad prosequendum, in order to appear in Hennepin County District Court on May 25, 2000. See, Affidavit of Donald Johnson, at ¶2 ("Johnson Aff."). The Plaintiff claims that, while in the custody of the ADC, he was physically assaulted by the Defendants Thomas Tichich ("Tichich"), Ryan Law ("Law"), Nancy Warolin ("Warolin"), Matthew Keith ("Keith"), Joseph Schwartz ("Schwartz"), and Amanda Moran ("Moran"), who are all Deputies with the Hennepin County Sheriff's Department. The assault allegedly occurred during the late evening on May 24, 2000, and on the morning of May 25, 2000. See, Ex. B to Johnson Aff. ("Inmate Behavior Chart" listing time of the incident as 11:45 o'clock p.m., on May 24, 2000). As the Defendants, except for the Defendant Patrick McGowan ("McGowan"), who is the Hennepin County Sheriff, are not seeking Summary Judgment on the excessive use of force

claim, and since McGowan's sole argument, as to that claim, is that he was not involved in the incident, we need not recite the details of that altercation. Suffice to say, the Plaintiff alleges that, during the assault, he was punched in the face and chest, he was grabbed by the hair, his head was slammed on the ground, his arm was twisted, he was punched or kicked in the genitals, and he ultimately passed out. Affidavit of Jonathan McClelland, at ¶¶3-4.

As a result of the altercation, involving the Plaintiff's struggle with the officers, the Plaintiff claims to have been injured. Id. At approximately 12:20 o'clock a.m., on May 25, 2000, the Plaintiff requested from a Sergeant whom he has identified as wearing badge number 1068, to see a nurse. See, Affidavit of Sgt. Timothy J. Hill, at ¶8 ("Hill Aff."). According to the Record presented, Sergeant Timothy J. Hill ("Hill"), who wears badge number 1068, notified the Defendant Sarah Skweres, R.N. ("Skweres"). Id.

At approximately 1:00 or 1:30 o'clock a.m., Skweres visited the Plaintiff. See, McClelland Aff., at ¶5; Affidavit of Sarah Skweres, at ¶4 ("Skweres Aff."); Affidavit of Linda Morgan-Stewart, at 4 ("Morgan-Stewart Aff.")(medical "narrative notes" completed by Skweres on May 25, 2000). At that time, the Plaintiff complained that he had been punched in the "nuts" and head, that his left thumb was broken, that he had knots on his head from being slammed

into the ground, and that he had scratches on his wrists. See, Skweres Aff., at ¶4; Morgan-Stewart Aff., at 4. He requested to see a doctor, and he asked to have x-rays taken. See, Skweres Aff., at ¶4; Morgan-Stewart Aff., at 4.

Apparently, Skweres conducted a brief, visual examination of the Plaintiff, through the pass-through door of the cell. See, McClelland Aff., at ¶5 (recalling that Skweres "never looked at my head or tried to ascertain whether my head or body was swollen or bruised," that she "didn't even talk to [him] face to face," and that "[s]he looked at my hand through the food passage in the door"); Skweres Aff., at ¶5. She observed that his left thumb had no bruising or swelling, and she reported that he refused to move his thumb, or his left hand and arm, so as to allow Skweres to compare his right and left hands. Skweres Aff., at ¶5; see also, Morgan-Stewart Aff., at 4. Skweres also noted that the Plaintiff's face was red in areas, but that he was coherent, alert, and oriented. Skweres Aff., at ¶4; see also, Morgan-Stewart Aff., at 4.

Although the Plaintiff asserts that his "hand was swollen at the time and was causing [him] a lot of pain," and that he allegedly asked for pain medication, McClelland Aff., at ¶5, Skweres took no other actions at that time, as "[the Plaintiff] did not tell [her] anything nor did [she] observe anything that caused

[her] to believe he required medical treatment of any kind or further medical attention at that time." Skweres Aff., at ¶6. She did return later, at approximately 3:00 o'clock a.m., and noted that he was lying on a bench with his eyes closed. Skweres Aff., at ¶8; see also, Morgan-Stewart Aff., at 4.

The Plaintiff spoke to Hill at about 4:00 o'clock a.m., on May 25, 2000, and agreed to cooperate with the remainder of the booking process. Hill Aff., at ¶9. Hill observed "redness and minor swelling on [the Plaintiff's] face" at that time, but related that the Plaintiff "did not request any further medical treatment[.]" Id. at ¶9. After the Plaintiff completed the booking process, at about 4:30 o'clock a.m., he was allowed to place a telephone call. See, McClelland Aff., at ¶6 He called a law firm, but only received an answering service, so he left a message. Id.

While the Plaintiff was being booked, Skweres again saw him, and noted that the redness on his face appeared to be superficial, and that there was no bleeding or swelling. Skweres Aff., at ¶9; see also, Morgan-Stewart Aff., at 4. The Plaintiff made no further complaints at that time and, when Skweres saw the Plaintiff again, at 6:00 o'clock a.m.,[1] she noted that he was moving his left hand,

---

[1]The medical "narrative notes" state that Skweres saw the Plaintiff at 6:00 o'clock a.m., on May 26, 2000. See, Affidavit of Linda Morgan-Stewart, at 5. Skweres related in her Affidavit, (continued...)

wrist, and thumb without difficulty, when he was unaware that he was being observed, although he favored his left arm, and squinted his left eye, when he saw that she was watching him. Skweres Aff., at ¶11; see also, Morgan-Stewart Aff., at 5.

Later in the morning of May 25, 2000, the Plaintiff was escorted to Court in Brooklyn Center, where he met with an attorney, and an investigator with the Public Defender's Office. See, McClelland Aff., at ¶7. The Plaintiff did advise the Public Defender about the assault, and also spoke to the Public Defender's investigator, John Lock ("Lock"). Id. Lock took notes regarding his discussions with the Plaintiff, but took no picturers, as he advised the Plaintiff that "his word was as good as pictures." Id. Lock later told the Plaintiff that the deputies, at the ADC, followed proper procedure, and the Plaintiff asserts that he did not trust Lock. Id.

After the Plaintiff returned to the ADC, he requested the use of the telephone, as he wished to call an attorney during business hours. Id. at ¶8. The Plaintiff advises that the officers refused his request, they did not inform him of any procedures for using the telephone, and they also refused to take pictures of him. Id.

---

[1](...continued)
however, that her medical notation regarding the date is in error, and that she actually saw the Plaintiff on May 25, 2000. Affidavit of Sarah Skweres, at ¶11.

Later that evening, the Plaintiff requested to be seen by a nurse, and one came and gave him medication for pain. Id. at ¶9. Nursing notes record that this occurred at about 9:45 o'clock p.m., on May 25, 2000, and that the Plaintiff complained that his wrist, throat, hips, back, and shoulder hurt, that he had a lump on his head, and that he was experiencing dizziness if he moved his head too fast. See, Morgan-Sterwart Aff., at 2 (medical "narrative notes" of Ericka Schmidt, R.N., dated May 25, 2000). The nurse observed several superficial scratches on the Plaintiff's face, neck, forehead, and upper torso/chest, although she noted no drainage or signs of infection from any of the scratches; a scrape, with minimal swelling, on the left side of the Plaintiff's forehead; redness above and below both eyes; moderate swelling on top of the Plaintiff's left hand, with no bruising or redness present; and superficial scratches on both hands and arm. Id. The nurse prescribed Advil for any discomfort, and instructed the Plaintiff to apply an ice pack to his wrist. Id. at 3. Later, when the nurse returned to check on the Plaintiff, he refused to allow her to check his vital signs, and she noticed that he did not appear to have any difficulty ambulating. Id.; see also, Ex. B to Johnson Aff. (notation at 1:38 o'clock a.m. on May 26, 2000, on "Inmate Behavior Chart").

During the evening of May 25, 2000, the Plaintiff had access to a telephone, but apparently, he had difficulty in using the collect telephone system in the building. He was attempting to contact an attorney at that time, but he again received an answering service because it was after business hours. McClelland Aff., at ¶9. He then called his aunt, Lesley Anizor ("Anizor"), and attempted to tell her what had occurred, but the telephone would purportedly disconnect, or there was "some type of interference" when he started talking about the incident. Id.; Affidavit of Lesley Anizor, at ¶2. Anizor was able to discern, however, that there had been some type of incident, and she believed that the Plaintiff's "life was in danger," or that "he might be subjected to more abuse by the defendants." Id. at ¶3. As a consequence, Anizor contacted and retained an attorney, Stephen Jankowski ("Jankowski").[2] Id. at ¶¶5, 7; see also, Affidavit of Stephen Jankowski, at 1 ("Jankowski Aff.").

---

[2]There is some inconsistency as to who actually contacted Jankowski, as both Anizor and Jankowski state that the contact came from Anizor, Affidavit of Lesley Anizor, at ¶¶5, 7; Affidavit of Stephen Jankowski, at 1, while the Plaintiff claims that he is the one who actually contacted Jankowski, McClelland Aff., at ¶9. This conflict in the evidence is not material, however, as the identity of the individual, who contacted Jankowski, is irrelevant to our discussion.

Jankowski traveled to the ADC to meet with the Plaintiff on May 25, 2000.[3] Jankowski Aff., at 1. He arrived at the ADC at around midnight, at which time he produced his attorney's license, and was told to wait. Id. Thereafter, an unidentified officer asked Jankowski if he had a camera and, when the officer was informed that Jankowski did possess a camera, the officer informed him that cameras were not allowed in the ADC. Id. Jankowski asked if there was a written policy to that effect, and the officer replied that there was no such policy. Id.

Jankowski then met with the Plaintiff, and observed bruising on his back, face, hand, and head. Id. Jankowski relates that he felt the bruises under the Plaintiff's hair, and noted that his hand appeared swollen and tender. Id. The Plaintiff also appeared to Jankowski to be "shaken up" by the incident, which he described to Jankowski. Id. After departing the ADC, Jankowski called Anizor, and advised her that the Plaintiff was "ok except for some bruises." Id. at 2.

Although Jankowski was not allowed to take photographs of the Plaintiff, Hill took photographs of him at approximately 5:00

---

[3]Jankowski's Affidavit states that he received a call from Anizor on May 24, 2000, at 9:00 o'clock p.m., see, Affidavit of Stephen Jankowski, at 1, but the recitation must be a typographical error as the Plaintiff had not even been involved in the altercation at that point.

o'clock a.m., on May 26, 2000, Hill Aff., at ¶12, and the Plaintiff was apparently photographed, at sometime on May 26, 2000, by Lieutenant Strom, at the request of Internal Affairs, see, Ex. 2 to McClelland Aff., at 1 ("Hennepin County Sheriff's Office Internal Affairs Investigation Investigative Report), and was also photographed when he returned to MCF-STW on May 26, 2000, see, Ex. E to Affidavit of Toni A. Beitz ("Beitz Aff.")(Department of Corrections Clinical Record). The Plaintiff was also examined by medical staff at MCF-STW upon his return on May 26, 2000. See, Exs. E and F to Beitz Aff. At that time, "red swollen areas [were] noted on [the Plaintiff's] face, chest, shoulders, [and] back." Ex. E to Beitz Aff. There were also "areas of discoloration on [the Plaintiff's] face around both eyes, shoulders and back." Ex. F to Beitz Aff. The medical notations relate that the Plaintiff had advised that he had lost consciousness at the time of the incident, id.; Ex. E to Beitz Aff., and that the Plaintiff complained that he could not "feel anything" in his left hand, from the side of his hand to his index finger, Ex. F to Beitz Aff.

X-rays taken on May 26, 2000, were negative. Id.; Exs. H-I to Beitz Aff. There was some swelling on the Plaintiff's hands, and a little swelling in his face, but no further swelling in his wrist. See, Ex. F to Beitz Aff. The attending physician concluded that the Plaintiff had sustained a "[c]ontusion to left hand," and

"[s]ubjective tenderness with discoloration marks around the face that look atypical for ecchymosis associated with a direct blow * * * [c]ould possibly be an abrasion or other type of injury." Id. The doctor also concluded that he was "unable to determine from this exam if these injures were inflicted by himself," and he prescribed Ibuprofen twice a day for ten days. Id.

As a result of this incident, the Plaintiff has sued the following individuals in their individual capacities: McGowan; Tichich; Law, Warolin; Keith; Schwartz; Skweres; and Moran. Amended Complaint, at 2 [Docket No. 38]. He has commenced his action, under Title 42 U.S.C. §1983, and claims that the actions of McGowan, Tichich, Law, Warolin, Keith, Schwartz, and Moran, constituted excessive use of force, and a denial of medical care, in violation of the Eighth Amendment; a denial of access to the Courts, in violation of the Sixth Amendment; and an unspecific violation of his right to due process, and equal protection of the law under the Fourteenth Amendment. The only constitutional claim against Skweres is the unspecified due process, and equal protection claim, and the claim for a denial of medical care. The Plaintiff also advances State law claims for assault, battery, and negligence.

In turn, the Defendants have brought this Motion for Partial Summary Judgment on a majority of the constitutional claims.[4] They acknowledge that there is a question of fact enveloping the excessive use of force claim, but they contend that a Summary Judgment should be entered in favor of all of the Defendants as to the claimed denial of medical care, the claimed denial of access to the Courts, and the claimed violations of the Fourteenth Amendment. Moreover, they urge that the claimed excessive use of force should also fail as to McGowan, as a pure matter of law, as he had no direct contact with the Plaintiff. Skweres is not implicated in the excessive use of force claim.

III. Discussion

Summary Judgment is not an acceptable means of resolving triable issues, nor is it a disfavored procedural shortcut when there are no issues which require the unique proficiencies of a Jury in weighing the evidence, and in rendering credibility determinations. See, Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986). Summary Judgment is appropriate when we have viewed the facts, and the inferences drawn from those facts, in a light most favorable to the nonmoving party, and we have found no triable issue. See, Duffy v. McPhillips, 276 F.3d 988, 991 (8th Cir. 2002); Schoolhouse, Inc. v.

[4]The Defendants' apparently do not seek Summary Judgment on the State law claims.

Anderson, 275 F.3d 726, 728 (8th Cir. 2002); Krentz v. Robertson Fire Protection Dist., 228 F.3d 897, 901 (8th Cir. 2000); Curry v. Crist, 226 F.3d 974, 977 (8th Cir. 2000); Carter v. St. Louis Univ., 167 F.3d 398, 400 (8th Cir. 1999). For these purposes, a disputed fact is "material" if it must inevitably be resolved, and the resolution will determine the outcome of the case, while a dispute is "genuine" if the evidence is such that a reasonable Jury could return a Verdict for the nonmoving party. See, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Herring v. Canada Life Assurance Co., 207 F.3d 1026, 1029 (8th Cir. 2000); Austin v. Minnesota Mining and Mfg. Co., 193 F.3d 992, 995 (8th Cir. 1999); Liebe v. Norton, 157 F.3d 574, 578 (8th Cir. 1998); Peter v. Wedl, 155 F.3d 992, 996 (8th Cir. 1998).

As Rule 56(e) makes clear, once the moving party files a properly supported Motion, the burden shifts to the nonmoving party to demonstrate the existence of a genuine dispute. In sustaining that burden, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavit or as otherwise provided in this Rule, must set forth specific facts showing that there is a genuine issue for trial." Rule 56(e), Federal Rules of Civil Procedure; see also, Anderson v. Liberty Lobby, Inc., supra at 256; Allen v. Entergy

Corp., 181 F.3d 902, 904 (8th Cir. 1999); Jauregui v. Carter Mfg. Co., 173 F.3d 1076, 1085 (8th Cir. 1999).

Moreover, the movant is entitled to Summary Judgment where the nonmoving party has failed "to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, supra at 322; see also, Hammond v. Northland Counseling Center, Inc., 218 F.3d 886, 891 (8th Cir. 2000); Greer v. Schoop, 141 F.3d 824, 826 (8th Cir. 1998). No genuine issue of fact exists in such a case, because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, supra at 323; see also, Bell Lumber and Pole Co. v. United States Fire Ins. Co., 60 F.3d 437, 441 (8th Cir. 1995); McLaughlin v. Esselte Pendaflex Corp., 50 F.3d 507, 510 (8th Cir. 1995); Settle v. Ross, 992 F.2d 162, 163 (8th Cir. 1993).

With these precepts in mind, we turn the Defendants' Motion for Partial Summary Judgment. Since the arguments of McGowan differ somewhat from those of the remaining Defendants, we first address his Motion, which pertains to all of the constitutional claims, followed by the remaining Defendants' contentions as to all of the constitutional claims, except for the claimed excessive use of force.

A. McGowan's Motion for Summary Judgment. In his initial Motion for Summary Judgment, McGowan claimed that he must be dismissed from the case, at least in regard to the constitutional claims, because there is no allegation that he was involved in the incident, or that he otherwise personally violated the Plaintiff's constitutional rights. In fact, the only mention of McGowan, in the Plaintiff's Amended Complaint, merely alleges that he is the Hennepin County Sheriff, and that he is being sued in his individual capacity. Amended Complaint, at ¶3. Of course, it is well settled that "Section 1983 liability cannot attach to a supervisor merely because a subordinate violated someone's constitutional rights." See, Otey v. Marshall, 121 F.3d 1150, 1155 (8th Cir. 1987).

Thus, the Plaintiff's Amended Complaint clearly has not specifically delineated the bases for suing McGowan on Section 1983 grounds. In opposing McGowan's Motion for Summary Judgment, the Plaintiff, for the first time, asserts that his claim against McGowan arises form his failure to train and supervise his subordinates. See, e.g., Tlamka v. Serrell, 244 F.3d 628, 635 (8th Cir. 2001)(stating that a supervisor is subject to Section 1983 liability only if he directly participated in the constitutional violation or if his failure to train or supervise the offending employee caused a violation of the constitutional right); Otey v.

Marshall, supra at 1155. Aside from the fact that the Amended Complaint failed to provide McGowan with any notice of the restructured claim, the claim is without merit.

In order to show that McGowan failed to supervise the remaining Defendants, the Plaintiff must show that McGowan:

> (1) [r]eceived notice of a pattern of unconstitutional acts committed by subordinates;
>
> (2) [d]emonstrated deliberate indifference to or tacit authorization of the offensive acts;
>
> (3) [f]ailed to take sufficient remedial action; and
>
> (4) [t]hat such failure proximately caused injury to [the Plaintiffs].

Otey v. Marshall, supra at 1155, quoting Jane Doe v. Special Sch. Dist. of St. Louis County, 901 F.2d 642, 645 (8th Cir. 1990); see also, Audio Odyssey, Ltd. v. Brenton First National Bank, 245 F.3d 721, 742 (8th Cir. 2001).

The Plaintiff has proffered no evidence, however, that McGowan was properly on notice of his officers' propensity toward unconstitutional acts. Indeed, the only argument the Plaintiff advances is that the other Defendants' continued course of conduct, which included the assault, and the subsequent alleged violations of various rules and regulations, should create an inference that McGowan was deliberately indifferent to the practices of his Deputies. For this proposition, the Plaintiff cites Bishop v. Stoneman, 508 F.2d 1224, 1226 (2nd Cir. 1974), in which the Court of Appeals for the Second Circuit concluded that a series of incidents, which occurred

over a period of a couple of months, when taken together, could disclose a pattern of conduct amounting to a deliberate indifference to the plaintiffs' serious medical needs. Id. Bishop involved a class action against the Commissioner of the Vermont Department of Corrections, and the Warden of the prison. Id.

Bishop, however, is plainly inapposite to the facts involved here. Not only was the procedural posture different, as Bishop pertained to a Motion to Dismiss rather than a Motion for Summary Judgment, but the occurrences, which formed the Complaint there, occurred over the course of a few months, in contrast to the less than two days at issue here. The Plaintiff has presented no evidence which would support any contention the McGowan was guilty of a failure to supervise other than the mere occurrence of the assault itself. See, Edwards v. Baier, 863 F.2d 606, 608 (8th Cir. 1989)("While the unfortunate incident that gives rise to this lawsuit would not have occurred if [the defendant police officer] had followed the [d]epartment's guidelines, police department guidelines do not create a constitutional right."). The Plaintiff offers no evidence that any of the Defendants, over whom McGowan has supervisory authority, had any particular history of employing excessive force, or that any other indicator was present which would have alerted McGowan to some proclivity in that direction. Accordingly, we conclude that McGowan cannot be held liable for any

constitutional violations that are predicated on a claimed failure to supervise.

As for the claimed failure to train, "'the inadequacy of police training may serve as the basis for §1983 liability only where the failure to train amounts to deliberate indifference to the rights of the persons with whom the police come into contact." Otey v. Marshall, supra at 1156, quoting City of Canton v. Harris, 489 U.S. 378, 388 (1989). Thus, as our Court of Appeals has observed:

> It is necessary to show that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need. In other words, the plaintiff must demonstrate that the [defendant] had notice that it procedures were inadequate and likely to result in a violation of constitutional rights.

Andrews v. Fowler, 98 F.3d 1069, 1076 (8th Cir. 1996) [internal quotations and citations omitted].

As was true with the claimed failure to supervise, however, there is no evidence proffered as to any deficiency in the training of the Sheriff's Deputies.

Instead, the Plaintiff argues that, because the Deputies assertedly violated rules and regulations of the ADC, there must have been a failure to train. His argument cannot be sustained,

however, as there must be a "deliberate indifference" to the need for training. A mere violation of rules and regulations, which do not necessary constitute a violation of the Plaintiff's constitutional rights, does not prove that the Deputies were inadequately trained. See, Owl v. Robertson, 79 F. Supp.2d 1104, 1114 (D. Neb. 2000)("Even if the failure to train or supervise caused the harm, there still must be a showing that the supervisor was 'deliberately indifferent' to the constitutional issues at stake."), citing Liebe v. Norton, 157 F.3d 574, 579 (8th Cir. 1998), for the proposition that "both a failure to train and failure to supervise claim require a showing of deliberate indifference." Here, the Plaintiff has isolated no training that was deficient, let alone training that was deliberately deficient. As such, we conclude that there is no basis for asserting a failure to train claim against McGowan, and we recommend that McGowan's Motion for Summary Judgment, on all of the constitutional claims, be granted.

B. The Defendants' Motion for Summary Judgment on the Deliberate Indifference to Medical Needs Claim.

The Plaintiff claims that the Defendants were deliberately indifferent to his serious medical needs, since he did not receive any treatment for an hour, or so, after the incident, and did not receive any "real" treatment for nineteen hours after the incident. He further claims that, although Skweres did see him an