hour, or so, after the altercation, she did not thoroughly examine him, and did not heed his request for further treatment. As a result, he asserts that the actions of the Defendants have violated his rights under the Eighth Amendment.

1. Standard of Review. One condition of confinement, to which the Eighth Amendment's protections attach, "is the medical attention given to a prisoner." Weaver v. Clarke, 45 F.3d 1253, 1255 (8th Cir. 1995). Of necessity, the circumstances of a prisoner's confinement restrict the free access that he might otherwise have in securing medical treatment. In a sense, a prisoner is at the forbearance of the prison officials for the provision of health care. As a consequence, the Courts have recognized that a prisoner's Eighth Amendment right to be free from cruel and unusual punishment "obligat[es] prison officials to provide medical care to inmates in their custody." Tlamka v. Serrell, supra at 631, citing Estelle v. Gamble, 429 U.S. 97, 102-03 (1976). A prisoner's rights, in this regard, are violated when prison officials are deliberately indifferent to the prisoner's serious medical needs. See, Estelle v. Gamble, supra at 104-05; Tlamka v. Serrell, supra; Dulany v. Carnahan, 132 F.3d 1234, 1237-38 (8th Cir. 1997); Bellecourt v. United States, 994 F.2d 427, 431 (8th Cir. 1993); Bailey v. Gardebring, 940 F.2d 1150, 1155 (8th Cir. 1991); DeGidio v. Pung, 920 F.2d 525, 531-32 (8th Cir. 1990).

An Eighth Amendment violation exists where the medical care, which is administered with respect to a prisoner's serious medical needs, "is so grossly incompetent or inadequate that it amounts to deliberate indifference." Bellecourt v. United States, supra at 634, citing Smith v. Jenkins, 919 F.2d 90, 93 (8th Cir. 1990). It is not enough that the medical care provided is negligent; that the prisoner disagrees with the prison official as to the appropriateness of the medical treatment; or that there is a delay in the treatment that does not result in substantial harm to the inmate. See, Jolly v. Knudsen, 205 F.3d 1094, 1096 (8th Cir. 2000)("The prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation"), quoting Estate of Rosenberg v. Crandell, 56 F.3d 35, 37 (8th Cir. 1995); Dulany v. Carnahan, supra at 1239 ("Mere negligence or medical malpractice, however, are insufficient to rise to a constitutional violation"); Kayser v. Caspari, 16 F.3d 280 (8th Cir. 1994)(stating that a mere disagreement with a course of treatment provided is not a sufficient basis for an Eighth Amendment violation).

As a general proposition, prison officials have violated the Eighth Amendment "only when two requirements are met." Farmer v. Brennan, 511 U.S. 825, 834 (1994). First, the "deprivation alleged must be objectively, sufficiently serious." Id., citing Wilson v.

Seiter, 501 U.S. 294, 298 (1991); see also, Tlamka v. Serrell, supra at 633; Dulany v. Carnahan, supra at 1239; Brown v. Nix, 33 F.3d 951, 955 (8th Cir. 1994). Second, to be liable, a prison official "must have a sufficiently culpable state of mind," Farmer v. Brennan, supra, citing Wilson v. Seiter, supra at 302-03, and in cases, such as this one, a subjective standard -- namely, a "deliberate indifference" to an inmate's health and safety -- must be satisfied before a finding of liability can attach. Id.

In Farmer, the Supreme Court elaborated upon the "deliberate indifference" standard by enunciating a "subjective test of culpability." Clark v. Armontrout, 28 F.3d 71, 72 (8th Cir. 1994). There, the Court held that "a prison official cannot be found liable under the Eighth Amendment * * * unless the official knows of and disregards an excessive risk to inmate health or safety." Farmer v. Brennan, supra at 832. In other words, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. at 837. Accordingly, an official cannot be held liable for an act or omission which is unaccompanied by the knowledge of a significant risk of harm, as such action, or inaction, "cannot under [the Supreme Court's] cases be condemned as the infliction of punishment." Id. at 838.

Deliberate indifference applies, then, to the requisite state of mind of the defendant; it is apathy or unconcern. See, Oldham v. Chandler-Halford, 877 F. Supp. 1340, 1354 (N.D. Iowa 1995). The specific circumstances of each case must be examined. Id. For instance, in Foulks v. Cole County, Mo., 991 F.2d 454, 446-57 (8th Cir. 1993), a delay of several days in the treatment of a bleeding and bruised prisoner raised a fact issue as to whether the defendants had acted with deliberate indifference. However, a brief delay in treatment is not deliberate indifference. See, Mills v. Smith, 656 F.2d 337, 339-40 (8th Cir. 1981). Furthermore, there is no deliberate indifference where no treatment is available for a condition. See, Bailey v. Gardebring, supra at 1155.

2. Legal Analysis. The Plaintiff's medical records, both those from the examinations at the ADC, and afterwards at MCF-STW, demonstrate that, as a result of the incident, he sustained "superficial" scratches to the neck, face, forehead, upper torso, hands and arm, as well as a scrape to his forehead with minimal swelling, redness around his eyes, and moderate swelling on his left hand. See, Morgan-Stewart Aff., at 2-3; see also, Skweres Aff., at ¶5 (noting that the Plaintiff did not have bruising or swelling on his thumb, but that he did have red areas on his face); Exs. E and F to Beitz Aff. (noting that the Plaintiff had "red swollen areas" on his face, chest, shoulders and back, as well as

"areas of discoloration" on his face around his eyes, shoulders and back, and concluding that the Plaintiff suffered a "[c]ontusion to left hand," and "[s]ubjective tenderness with discoloration marks around the face that look atypical for ecchymosis associated with a direct blow * * * [c]ould possibly be an abrasion or other type of injury"). The Plaintiff asks that we conclude that these injuries were objectively serious, as he "had a reasonable basis to believe that he might have had, in the least, a mild concussion and/or a broken wrist or arm." Plaintiff's Memorandum in Opposition to Defendants' Motion for Partial Summary Judgment, at 14.

"To constitute an objectively serious medical need or a deprivation of that need," our Court of Appeals has instructed that "the need or the deprivation alleged must be either obvious to the layperson or supported by medical evidence, like a physician's diagnosis." Aswegan v. Henry, 49 F.3d 461, 463 (8th Cir. 1995). More specifically, an "objectively serious medical need" is "one that is obviously serious and involves 'an excessive risk to the inmate's health," or one for which medical evidence supports its seriousness." Johnson v. Crist, 2001 WL 1636242 at *2 (D. Minn. May 7, 2001), quoting Dulany v. Carnahan, supra at 1239. Given these directives, we have no basis upon which to conclude that, at the time he complains of, the Plaintiff suffered from objectively serious medical needs. At most, he had sustained scratches and

bruises, which were accompanied by minor swelling. In fact, the Plaintiff's own attorney, Jankowski, related that, upon visiting the Plaintiff approximately twenty-four hours after the incident -- during which time he observed bruises on the Plaintiff's face, back, hands and head, as well as bruises under the Plaintiff's hair -- he called the Plaintiff's aunt and advised her that the Plaintiff was "ok except for some bruises." Jankowski Aff., at 2-3. There is absolutely no evidence that he was bleeding from any of his injuries, or that any of the injuries developed into more serious problems as a result of inattention. Moreover, his mere assertion, that he thought he might have had a concussion, or a broken wrist, is plainly not sufficient for these purposes. See, e.g., Kayser v. Caspari, supra at 281 ("Kayser's self-diagnosis alone cannot establish that he does, in fact, suffer from kidney stones and the available medical evidence does not support his self-diagnosis.").

Nonetheless, even if we were to assume that the Plaintiff has shown that he was suffering from objectively serious medical needs, he clearly has failed to provide any competent evidence that any of the Defendants were deliberately indifferent to his needs. Rather, at the most, one and one-half hours after the incident, the Plaintiff was visited by Skweres. Skweres Aff., at ¶4; Morgan-Stewart Aff., at 4. While the Plaintiff complains about the delay between

the time he was injured, and Skweres' visit, he has not shown that the delay caused him any additional harm. See, e.g., Roberson v. Bradshaw, 198 F.3d 345, 647 (8th Cir. 1999)("[A]n inmate who complains that delay in medical treatment [has risen] to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed."), quoting Hill v. Dekalb Regional Youth Detention Center, 40 F.3d 1176, 1188 (11th Cir. 1994).

At the time of her first visit,[5] Skweres noted the Plaintiff's complaints, indicating that he had complained that he had been punched in the "nuts" and head, that his left thumb was broken, that he had knots on his head from being slammed into the ground, and that he had scratches on his wrists. Skweres Aff., at ¶4. She did a visual examination of the Plaintiff, noting that he had no bruising or swelling on his left thumb, but that his face was red in areas. Id. She further related, without contradiction in this Record, that, when she asked the Plaintiff to move his thumb or his left hand and arm to allow her to compare the right and left hands, the Plaintiff refused to do so. Id. at ¶5. She eventually left

---

[5]Although Skweres visited with the Plaintiff shortly after 1:30 o'clock a.m. on May 25, 2000, it appears that she also walked by the Plaintiff's cell shortly after 1:00 o'clock the same morning, and looked into the cell. See, Plaintiff's Ex. 1 (videotape of the ADC). Regardless, however, we will assume that the first time she saw the Plaintiff was shortly after 1:30 o'clock a.m.

the Plaintiff without supplying him any medication, or acceding to his demand for an x-ray, or a doctor's consult, as "[the Plaintiff] did not tell [her] anything nor did [she] observe anything that caused [her] to believe he required medical treatment of any kind or further medical attention at that time." Id. at ¶6.

Nonetheless, Skweres did check on the Plaintiff at approximately 3:00 o'clock a.m., on the same morning, and noted that he was lying on a bench with his eyes closed. Id. at ¶8. She later saw him, while he was being booked, which occurred around 4:30 o'clock a.m., and noted that the redness on his face appeared to be superficial, and that there was no bleeding or swelling. Id. at ¶9. This assessment is confirmed by Hill, who observed the Plaintiff at about 4:00 o'clock a.m., and saw "redness and minor swelling on [the Plaintiff's] face," although he noted that the Plaintiff did not request any further medical treatment at the time. Hill Aff., at ¶9. Even later, at 6:00 o'clock a.m., on May 25, 2000, Skweres again observed the Plaintiff, and noted that he was moving his left hand, wrist, and thumb without difficulty, when he was unaware that he was being observed, although he began favoring his left arm, and squinted his left eye, when he saw that she was watching him. Skweres Aff., at ¶11.

On this Record, it is clear that Skweres was not deliberately indifferent to the Plaintiff's objectively serious medical needs.

She examined him first, about one and one-half hours after the alleged assault, and while she did not do as thorough an examination as the Plaintiff would have liked, it appears that she was also hampered in her efforts by the Plaintiff's refusal to allow her to compare his right and left hand. Concluding that no further treatment or pain medication was necessary, she moved on. Nonetheless, she did check on the Plaintiff at least three other times on the same morning, and each time observed the Plaintiff in no apparent distress.

While it is true that another nurse gave the Plaintiff pain medication, on the evening of May 25, 2000, and instructed the Plaintiff to use an ice pack on his wrist, we are unable to conclude that the difference in the treatment prescribed evidenced deliberate indifference on the part of Skweres. Rather, from all indications, it appears that Skweres observed the Plaintiff's injuries, and made a medical determination based on her observations, as well as the Plaintiff's actions. Thus, there appears, on the basis of this Record, to have been a simple disagreement over the appropriate course of treatment for the Plaintiff's injuries, which does not rise to the level of deliberate indifference. See, e.g., Jolly v. Knudsen, supra at 1096 ("The prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a

constitutional violation"), quoting Estate of Rosenberg v. Crandell, supra at 37; Wolfe v. Hiakel, 1996 WL 102565 at *1 (8th Cir. March 8, 1996) [unpublished decision]("Wolfe's claim that he was denied adequate pain medication does not evidence deliberate indifference, but a disagreement with the course of treatment."). Absent from the Plaintiff's proof is any competent medical opinion that the care given was so inadequate, for such a period of time, as to have constituted a constitutional violation. As such, we conclude that the Plaintiff has not shown that Skweres was deliberately indifferent to his serious medical needs, and therefore, we recommend that her Motion for Summary Judgment be granted.

The same holds true for the remaining Defendants. Given the fact that the Plaintiff was seen on a number of occasions, by a couple of different nurses, and that he did not suffer any additional injury due to the delay in his treatment, we find that he has not provided evidence that the remaining Defendants were deliberately indifferent to his serious medical needs. Rather, since Skweres, and another nurse, had seen the Plaintiff, and had prescribed the treatment they deemed appropriate, we find it unpersuasive to suggest that, in the absence of an obvious disregard for their responsibilities, the remaining Defendants were required to second-guess the health care practitioners, and provide or seek additional care for the Plaintiff. As a consequence, given

the fact that the Plaintiff was only suffering from minor scratches, bruises, and swelling, the decision of the remaining Defendants, to rely on the medical determinations of Skweres, and the other nurse, cannot not rise to a deliberate indifference toward his serious medical needs and, as such, we recommend that their Motion for Summary Judgment, on this claim, be granted.

C. The Defendants' Motion for Summary Judgment on the Denial of Access to the Courts Claim.

The Plaintiff alleges that he was denied access to the Courts, as he was not allowed to contact an attorney during "business hours," and because his attorney was not allowed to bring a camera into the jail, and take pictures of his asserted injuries. As a result, he claims that his rights under the Sixth Amendment were violated.

In order to state a claim for denial of access to the Courts, an inmate must not only show some denial of a right, but also "'demonstrate that a nonfrivolous legal claim has been frustrated or was being impeded.'" Moore v. Plaster, 2001 WL 1112027 at *4 (8th Cir., September 24, 2001), quoting Johnson v. Missouri, 142 F.3d 1087, 1089 (8th Cir. 1998). Thus, there is a requirement of "actual injury" to maintain such a claim. See, Lewis v. Casey, 518 U.S. 343, 349, 315 (1996). As a consequence, we conclude that the Plaintiff clearly cannot maintain a claimed denial of access aris-

ing from an asserted failure to allow him to contact an attorney, as he has not alleged, let alone shown, that he was somehow prejudiced by the Defendants' actions. Rather, on May 25, 2000, the Plaintiff was able to talk to his Public Defender, and an investigator from the Public Defender's Office, see, McClelland Aff., at ¶7, and he was also able to retain Jankowski, who visited him during the evening of May 25, 2000, and the early morning of May 26, 2000. See, Jankowski Aff., at 1. Thus, within twenty-four hours after the alleged assault, the Plaintiff personally spoke with two attorneys, and he has offered no showing that the alleged delay caused any injury, and, therefore, his claimed denial of access, on this ground, must fail.

Consequently, the only other basis for the Plaintiff's denial of access claim would be the fact that his attorney was not allowed to photograph him on the evening of May 25, 2000. Of course, he was later photographed by Hill, during the early morning of May 26, 2000, and later during the day, by Internal Affairs and MCF-STW staff. Therefore, the only potential injury, that could be claimed by the Plaintiff is that he was not able to take photographs until approximately twenty-four hours after the incident.

We will assume, for purposes of this Motion, that by denying the Plaintiff's request for photographs, or by prohibiting Jankowski's request to take a camera into the ADC, the ADC officials

violated the Plaintiff's right of access of the Courts. The Defendants are entitled, nonetheless to Summary Judgment, on the basis of qualified immunity.[6]

Government officials, who are performing discretionary functions, are generally shielded from liability for civil damages unless their conduct violates clearly established statutory or constitutional rights, of which a reasonable person would have known. See, Wilson v. Layne, 526 U.S. 603, 609 (1999); Young v. Harrison, 284 F.3d 863, 866 (8th Cir. 2002); Winters v. Adams, 254 F.3d 758, 766 (8th Cir. 2001). In order "[t]o withstand a claim of qualified immunity at the summary judgment stage, a plaintiff must assert a violation of constitutional or statutory right; that right must have been clearly established at the time of the violation; and given the facts most favorable to the plaintiff, there must be no genuine issue of material fact as to whether a reasonable officer would have known that alleged action indeed violated that right." Mettler v. Whitledge, 165 F.3d 1197, 1202 (8th Cir. 1999); see also, Young v. Harrison, supra at 866-67.

---

[6]In addition to the fact that the Defendants are entitled to Summary Judgment on the basis of qualified immunity, we also note that there is no allegation, let alone evidence, that any of the named Defendants actually denied the Plaintiff's request for photographs, or Jankowski's request to bring a camera into the ADC. Rather, the Amended Complaint fails to identify the individual(s) who denied those requests.

"[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action, assessed in the light of the legal rules that were 'clearly established' at the time it was taken." Wilson v. Layne, supra at 614. The contours of the constitutional right at issue "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right," but "[t]his is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in light of pre-existing law, the unlawfulness must be apparent." Anderson v. Creighton, 483 U.S. 635, 641 (1987). Thus, "[t]he doctrine 'gives ample room for mistaken judgments but does not protect the plainly incompetent or those who knowingly violate the law.'" Bagby v. Brondhaver, 98 F.3d 1096, 1098 (8th Cir. 1996).

In this instance, the Plaintiff claims that his "clearly established" constitutional right is his right of access to the Courts, which, in this context, includes the right to have photographs taken, either by the ADC staff, or his attorney, within twenty-four hours of the alleged incident. Our independent research has revealed no case law which imparts such a right, nor has it revealed any analogous right. As such, by denying the Plain-

tiff's request, or the request of Plaintiff's attorney, to take photographs of the Plaintiff within twenty-four hours after the incident, the Defendants, if they were even involved in denying the Plaintiff's requests for photographs, would not have known that they were violating the Plaintiff's "clearly established" constitutional right. Consequently, even if the Plaintiff had established that he had a constitutional right to have pictures taken of him, during the relevant time period, the Defendants' are, nevertheless, entitled to Summary Judgment based on qualified immunity. We recommend, therefore, that the Defendants' Motion for Summary Judgment on this issue be granted.

D. <u>The Defendants' Motion for Summary Judgment on the Due Process and Equal Protection Claims</u>.

The basis for the Plaintiff's due process and equal protection claims remain far from clear. Rather, he seems to merely piggy-back his other constitutional claims -- the Sixth and Eighth Amendment assertions -- into a Fourteenth Amendment claim. As the Supreme Court has stated, however, "[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." <u>County of Sacramento v. Lewis</u>, 523 U.S. 833, 842 (1998).

Here, the Plaintiff relies on the "intertwined" nature of the claimed violation of the Fourteenth Amendment, "and his fundamental rights enumerated in other parts of the Constitution." Plaintiff's Memorandum in Opposition to Defendants' Motion for Partial Summary Judgment, at 17. He has utterly failed, however, to explain how his rights under the due process clause of the Fourteenth Amendment were violated, apart from his allegation of excessive use of force, deliberate indifference to his serious medical needs, or a claimed violation of his right of access to the Courts. Further, his Amended Complaint is devoid of any allegation that he was treated differently from a similarly situated individual. See, e.g., City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432 (1985). As such, we conclude that the Plaintiff's claims under the Fourteenth Amendment are simply derivative of his more specific claims under the Sixth and Eighth Amendment and, therefore, we recommend that the Defendants' Motion for Summary Judgment on these claims also be granted.[7]

[7]The Plaintiff sought to have the Defendants' Motion for Summary Judgment denied, without further inquiry, claiming that it was served, and filed, later than the deadline prescribed in our Order dated December 20, 2001. Docket No. 30. By that Order, we required any dispositive Motions to be served, and filed, by March 22, 2002. Id. The Plaintiff claimed that he did not receive the Motion until March 25, 2002, and he also notes that the Motion was not filed, with the Court, until March 25, 2002. Plaintiff's Memorandum in Opposition to Defendants' Motion for Partial Summary (continued...)

NOW, THEREFORE, It is --

ORDERED:

That the Defendants' Motion for Leave to File Affidavit [Docket No. 63] is DENIED, as moot.

AND, It is --

RECOMMENDED:

That the Defendants' Motion for Partial Summary Judgment [Docket No. 42] be GRANTED.

BY THE COURT:

Raymond L. Erickson
UNITED STATES MAGISTRATE JUDGE

---

[7](...continued) Judgment, at 2.

Given these contentions, the Defendants brought a Motion which asked us to accept the Affidavit of Wessels, as an attachment to their Reply Memorandum. The reason for the Affidavit was to establish that their Motion for Partial Summary Judgment was submitted to the Clerk of Court's Office on March 21, 2002. We conclude, however, that the Affidavit is not necessary to our determination as to the timeliness of the Defendants' Motion for Summary Judgment, as the Affidavit of Service, which is attached to the Defendants' Motion for Partial Summary Judgment, establishes that the Motion was served by mail on March 21, 2002. Docket No. 42. Of course, service by mail is complete upon mailing, see, Rule 5(b), Federal Rules of Civil Procedure, so the Motion was timely. Accordingly, the Affidavit of Wessels has not been considered on the substance of the Defendants' Motion, and we recommend that the Plaintiff's request, that Summary Judgment be denied on timeliness grounds, be rejected as without merit.

**N O T I C E**

Pursuant to Rule 6(a), Federal Rules of Civil Procedure, D. Minn. LR1.1(f), and D. Minn. LR72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties **by no later than August 30, 2002,** a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections. Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing **by no later than August 30, 2002,** unless all interested parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to review the transcript in order to resolve all of the objections made.